FILED

JUL - 7 2017

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| RHONDA USES MANY, ADMINISTRATIX OF THE ESTATES OF BRITTANY BUFFALO, DECEASED, AND WACO BUFFALO, DECEASED,<br><br>  Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>  Defendant. | 3:15-CV-03004-RAL<br><br><br>OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |

Plaintiff Rhonda Uses Many is the Administratrix of the Estate of Brittany Buffalo and Waco Buffalo. Uses Many has sued the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, alleging that the negligence of a Cheyenne River Sioux Tribe (CRST) Police Department employee during a high-speed vehicle pursuit caused the deaths of Brittany and Waco. Doc. 1. The United States filed an answer denying liability, Doc. 7, and then filed a motion to dismiss for lack of jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or alternatively, a motion for summary judgment under Rule 56(c), Doc. 16. Uses Many opposed this motion, and both parties submitted additional materials outside the pleadings. Docs. 18–19, 22–25. For the reasons explained below, this Court grants the United States' motion to dismiss.

1

## I. Facts

Around 1:00 a.m. on the morning of July 11, 2013, Brittany was driving a vehicle on South Dakota Highway 212 on the Cheyenne River Sioux Indian Reservation. Doc. 1 at ¶ 6; Doc. 18 at ¶ 2; Doc. 24 at ¶ 2. Also in the vehicle were Shondo Talks and Waco, Brittany's brother. Doc. 1 at ¶ 6. Meanwhile, CRST police officer Terry Long Mandan was in his patrol vehicle at the junction of Highways 63 and 212, facing west. Doc. 18 at ¶ 2; Doc. 24 at ¶ 2. Brittany made a wide turn onto Highway 63, almost traveling into the west ditch, before swerving towards the centerline and then onto the west white fog line. Doc. 1 at ¶ 7; Doc. 18 at ¶ 2; Doc. 24 at ¶ 2. Officer Long Mandan observed the wide turn and swerving, and then followed the vehicle for at least a quarter mile, before activing his overhead flashers to stop the vehicle for careless driving. Doc. 18 at ¶ 3; Doc. 24 at ¶ 3. Officer Long Mandan did not know at the time who was in the vehicle, or have any knowledge of crimes committed other than careless driving.[1] Doc. 23 at ¶ 3; Doc. 19-1 at 3.

Brittany did not stop the vehicle, and instead sped up, prompting Officer Long Mandan to turn on his lights and siren and to begin pursuing the vehicle. Doc. 1 at ¶ 7; Doc. 18 at ¶¶ 4–5; Doc. 24 at ¶¶ 4–5. Talks later told Officer Long Mandan that he and Waco had told Brittany to stop for the police vehicle, but that she kept going. Doc. 18 at ¶ 20; Doc. 24 at ¶ 20. Officer Long Mandan made contact with dispatch during the pursuit, but there was no supervisor on duty. Doc. 18 at ¶¶ 5, 7; Doc. 24 at ¶¶ 5, 7.

The pursuit lasted for eleven miles, with the vehicles reaching speeds well above 100 miles per hour. Doc. 1 at ¶ 8; Doc. 18 at ¶¶ 6, 11; Doc. 24 at ¶¶ 6, 11. During the pursuit,

---

[1] Officer Long Mandan may have had suspicion of driving under the influence of alcohol as the underlying cause of the careless driving. Once the vehicle began fleeing from the attempted stop by law enforcement, suspicion of driving under the influence and of other possible criminal activity of course would intensify.

Brittany's vehicle traveled in the opposite lane at times. Doc. 18 at ¶ 6; Doc. 24 at ¶ 6. The pursuit met one vehicle on Highway 63, which pulled over, allowing the vehicles to pass. Doc. 18 at ¶ 9; Doc. 24 at ¶ 9. During the pursuit, Officer Long Mandan's vehicle never made contact with Brittany's vehicle, staying 50 to 100 yards away. Doc. 18 at ¶ 10; Doc. 24 at ¶ 10. As Brittany's vehicle was traveling south, in the direction of off-reservation Stanley County, Officer Long Mandan asked dispatch to contact higher command, either Lieutenant Chad Olson or Chief of Police Burton In The Woods, but neither were on duty. Doc. 18 at ¶ 12; Doc. 24 at ¶ 12. Officer Long Mandan advised dispatch to have an ambulance on standby before the pursuit came to an end. Doc. 19-1 at 6; Doc. 23 at ¶ 6.

Around 1:18 a.m., Brittany's vehicle traveled towards the west ditch near a curve in the road, overcorrected, swerved towards the east ditch, rolled over and down a hill to the east of the highway, and stopped on its roof. Doc. 1 at ¶ 8; Doc. 18 at ¶¶ 13–14; Doc. 24 at ¶¶ 13–14. Officer Long Mandan requested an ambulance at the scene, and after approaching helped Talks out of the front passenger window. Doc. 18 at ¶¶ 15–17; Doc. 24 at ¶¶ 15–17. Officer Long Mandan requested extrication equipment from dispatch after seeing Waco partially ejected and pinned underneath the vehicle. Doc. 18 at ¶ 18; Doc. 24 at ¶ 18. Officer Long Mandan then located Brittany lying motionless approximately 100 feet from the vehicle. Doc. 18 at ¶ 19; Doc. 24 at ¶ 19. Ambulances transported Brittany, Waco, and Talks to the Indian Health Service Hospital in Eagle Butte, and later autopsy examinations revealed that Brittany and Waco died from blunt force trauma injuries. Doc. 1 at ¶ 8; Doc. 18 at ¶¶ 21–22; Doc. 24 at ¶¶ 21–22. A toxicology report indicated that Brittany had alcohol in her system at the time of death. Doc. 18 at ¶¶ 23–24; Doc. 24 at ¶¶ 23–24. An accident reconstruction done by the South Dakota

Highway Patrol surmised that Brittany was driving the vehicle at 131 miles per hour when the rollover occurred. Doc. 18 at ¶ 25; Doc. 24 at ¶ 25.

On March 18, 2014, Uses Many filed an administrative tort claim, seeking $1,500,000 in damages; Uses Main was given notice of the claim's denial on September 17, 2014. Doc. 1 at ¶ 13. On March 11, 2015, Uses Many filed this suit against the United States, seeking the same amount plus costs for the deaths of Brittany and Waco, who were 26 and 23 years of age at the time of their deaths. Doc. 1. Uses Many alleges that the negligence of Officer Long Mandan in the course of the high speed pursuit by "[f]ailing to use proper protocol to engage a vehicle stop," "[f]ailure to follow proper protocol regarding vehicle pursuit," "[f]ailure to follow instruction to end high speed pursuit," "[f]ailure to recognize dangers of high speed pursuit," and other facts caused the deaths of Brittany and Waco. Doc. 1 at ¶ 9.

After filing an answer, Doc. 7, the United States filed a motion to dismiss under Rule 12(b)(1) or 12(b)(6), and a motion for summary judgment under Rule 56(c) in the alternative. Doc. 16. The United States argues that Officer Long Mandan's actions during the pursuit were the product of discretion, which is an exception to tortuous conduct for which the United States can be liable for under the FTCA. Doc. 17 at 6. The United States also argues that Uses Many failed to state a claim upon which relief can be granted because she did not show the existence of any duty that Officer Long Mandan held towards Brittany and Waco under South Dakota state negligence law. Doc. 17 at 13. Finally, in the alternative, the United States argues that Officer Long Mandan was not negligent, and did not violate any applicable duty of care, entitling it to summary judgment. Doc. 17 at 14. Along with this motion, the United States filed a statement of undisputed facts, and several supporting documents. Docs. 18–19, 19-1–19-6. Uses Many opposed dismissal, arguing that CRST policy requires supervisory oversight during pursuits, and

because no supervisor was available, the pursuit should not have occurred. See Doc. 22. Uses Many also responded to the United States' statement of undisputed facts, filed her own statement of undisputed material facts, and included several supporting documents. Docs. 22, 22-1–22-3, 23, 24. The United States' reply focuses on the lack of an analogous private right of action under state law for Officer Long Mandan's allegedly negligent conduct. Doc. 25.

## II.     Motion to Dismiss Standard

The United States asserts lack of federal court subject matter jurisdiction and failure to state a claim for which relief can be granted, moving to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Questions of the existence of federal jurisdiction under Rule 12(b)(1) must be decided first, and are for the court to decide alone, regardless of whether the issues involve questions of law or fact. Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990). A Rule 12(b)(1) challenge to subject matter jurisdiction can be either facial or factual in nature. Id. at 729 n.6. A facial challenge to federal jurisdiction limits the court to considering the allegations in the plaintiff's complaint, and it must view the allegations in the light most favorable to the plaintiffs. See Stalley v. Catholic Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007). A factual challenge to federal jurisdiction gives the court the freedom "to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and it need not view the evidence in the light most favorable to the non-moving party. See Osborn, 918 F.2d at 729 n.6, 730 (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

The United States has submitted evidence outside of the initial pleadings in support of its Rule 12(b)(1) motion, mounting a factual challenge to this Court's subject matter jurisdiction by contending that Officer Long Mandan was acting in a discretionary function. Doc. 17 at 3, 5–8;

Docs 19, 19-1–19-6. This Court can thus "look outside the pleadings in order to determine whether subject matter jurisdiction exists." Green Acres Enters., Inc. v. United States, 418 F.3d 852, 856 (8th Cir. 2005); see also Lightning Fire v. United States, No. 3:15-CV-03015-RAL, 2017 WL 1944105, at *2–3 (D.S.D. May 9, 2017). The decision to grant the United States' motion to dismiss can be based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Johnson v. United States, 534 F.3d 958, 962 (8th Cir. 2008) (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)). By bringing suit and seeking to establish jurisdiction, Uses Many retains the burden of showing that this Court has jurisdiction. See Great Rivers Habitat Alliance v. FEMA, 615 F.3d 985, 988 (8th Cir. 2010); Riley v. United States, 486 F.3d 1030, 1032 (8th Cir. 2007).

### III.    Discussion

Under the FTCA, the United States is "liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813 (1976). The FTCA thus waives, in a limited fashion, the sovereign immunity of the United States. See Mader v. United States, 654 F.3d 794, 797 (8th Cir. 2011). The FTCA waives the United States' sovereign immunity for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The "law of the place" when an act occurs on Indian land is the state within which the land is located—South Dakota in this case. LaFramboise v. Leavitt, 439 F.3d 792, 796 (8th Cir. 2006).

Congress has extended the FTCA's waiver of the United States' sovereign immunity to include claims that arise from the performance of duties under a contract issued pursuant to the Indian Self-Determination and Education Assistance Act (ISDEAA). See Pub. L. No. 101-512, § 314, 104 Stat. 1915, 1959–60 (Nov. 5, 1990) (codified at 25 U.S.C.A. § 5321 Historical and Statutory Notes); Hinsley v. Standing Rock Child Protective Servs., 516 F.3d 668, 672 (8th Cir. 2008). The CRST operates its police department pursuant to an ISDEAA contract. See Doc. 1 at ¶¶ 4–5; Doc. 17 at 6 n.2.

Liability under the FTCA does not extend to certain statutory exceptions. See 28 U.S.C. § 2680. One of those exceptions is for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. § 2680(a). If a federal employee is found to be acting in a "discretionary function," the FTCA does not waive the United States' sovereign immunity, and district courts lack the necessary subject matter jurisdiction to hear the claim. See Hart v. United States, 630 F.3d 1085, 1088 (8th Cir. 2011); Green Acres Enters., Inc., 418 F.3d at 857. To determine whether a federal employee was exercising discretion sufficient to be excepted from the FTCA, a two-part test applies. See C.R.S. ex rel. D.B.S. v. United States, 11 F.3d 791, 795 (8th Cir. 1993) (citing Berkovitz v. United States, 486 U.S. 531, 536 (1988)).

> First, the conduct at issue must be discretionary, involving an element of judgment or choice. The second requirement is that the judgment at issue be of the kind that the discretionary function exception was designed to shield. Because the exception's purpose is to prevent judicial second-guessing of government decisions based on public policy considerations, it protects only those judgments grounded in social, economic, and political policy.

Hart, 630 F.3d at 1088 (quoting Riley, 486 F.3d at 1032). "If the employee violated a mandatory statute, regulation, or policy, the conduct does not involve an element of judgment or choice, and

therefore, the conduct is not sheltered from liability under the discretionary function exception." Hinsley, 516 F.3d at 672. If there was no mandatory statute, regulation, or policy in place to guide the decision making, courts then look to whether the challenged decision was "grounded in social, economic, or political policy." See Dykstra v. U.S. Bureau of Prisons, 140 F.3d 791, 795 (8th Cir. 1998).

Uses Many bases her negligence claim on Officer Long Mandan's conduct in initiating and continuing the pursuit allegedly contrary to CRST and BIA[2] policy. See Doc. 1. at ¶¶ 9–10. The CRST and the BIA have policies in place for pursuits, covering general policies, initiation, continuation, and termination of pursuits. Doc. 22-1; Doc. 22-2. Uses Many argues that because Officer Long Mandan did not follow certain procedures during the pursuit, his decisions are not protected by the discretionary function exception. Doc. 22 at 4–5.

First, Uses Many points out CRST's general policy that "good judgment and common sense must be used in every vehicle pursuit." Doc. 22 at 4; Doc. 22-1 at § I.4.8. This general axiom is not the sort of "mandatory statute, regulation, or policy" that makes an action non-discretionary, but explicitly involves "an element of judgment or choice." See Hinsley, 516 F.3d at 672; Hart, 630 F.3d at 1088. Uses Many does not here allege any particular aspect of Officer Long Mandan's decision making that did not comply with "good judgment and common sense."

Second, Uses Many points to the policy that "the officer must make a decision whether the crime at issue warrants a chase at a high rate of speed," and that "[t]he pursuit here was for [a] minor traffic offense." Doc. 22 at 4; Doc. 22-1 at § I.4.9. The seriousness of the crime is one of seven questions the CRST pursuit policy outlines for officers to consider when deciding

---

[2] The BIA policy is included in the record, but Uses Many refers only to the CRST policy in her brief. See Doc. 22-2. The BIA policy contains no requirement of a supervisor's approval to initiate or continue a pursuit. In the BIA policy, however, dispatch is required to notify the "on-duty" supervisor of the pursuit, and the supervisor "is ultimately responsible for terminating the pursuit or allowing it to continue." Doc. 22-2 at 5.

whether to pursue a fleeing vehicle, and the general policy states "Officers will pursue . . . traffic violators who fail to yield upon receiving proper notice." Doc. 22-1 at §§ I.4.8–9. It was not in violation of any mandated policy for Officer Long Mandan to initiate a pursuit after witnessing a careless driving offense, and a driver who failed to subsequently yield to a law enforcement stop.

Third, Uses Many cites § I.4.11(A)(1) and (3), that the pursuit should be discontinued if "[t]he hazards of exposing the officer and the public to unnecessary dangers do not warrant continuation," or "[t]he offense is a misdemeanor and the identity of the violator is known." Doc. 22 at 4. Officer Long Mandan did not know who was driving the vehicle at the time of the pursuit, barring applicability of § I.4.11(A)(3). See Doc. 19-1 at 3. Uses Many alleges that Officer Long Mandan ignored hazards and unnecessary dangers under § I.4.11(A)(1) by following the "vehicle for a distance of 11 miles at speeds of up to 120 miles an hour," and "being so sure that a wreck was to occur that he ordered an ambulance even before the wreck occurred." Doc. 22 at 4. The pursuit indeed lasted 11 miles and involved extremely high speeds, but occurred in an isolated, rural area, on a clear-weather night, with only one other vehicle in the vicinity. Although Officer Long Mandan requested an ambulance to be on standby during the pursuit, the request came just two minutes before the vehicle crashed, and only after Officer Long Mandan observed and told dispatch that the vehicle was swerving into both lanes. See Doc. 23-2. The CRST pursuit policy does not list specific criteria for when "[t]he hazards of exposing the officer and the public to unnecessary dangers do not warrant continuation." Doc. 22-1 at § I.4.11(A)(1). Whether such conditions merit discontinuing a pursuit involves "an element of judgment or choice." Hart, 630 F.3d at 1088 (quoting Riley, 486 F.3d at 1032); see Deuser v. Vecera, 139 F.3d 1190, 1195 (8th Cir. 1998) ("Law enforcement decisions of the kind involved in making or terminating an arrest must be within the discretion and judgment of

enforcing officers."); Holthusen v. United States, 498 F. Supp. 2d 1236, 1241–43 (D. Minn. 2007) (finding some aspects of a tribal police pursuit policy discretionary when determining whether a pursuing officer should be extended official immunity under Minnesota law in FTCA claim); see also Scott v. Harris, 550 U.S. 372, 383–85 (2007) (finding it reasonable for an officer to terminate a pursuit by ramming the chased vehicle, and discussing the choice facing the officer between "the risk of bodily harm that [the officer's] actions posed to [the driver] in light of the threat to the public that [the officer] was trying to eliminate"); Hurtado v. United States, No. H-94-2483, 1996 WL 65115, at *10–11 (S.D. Tex. Feb. 8, 1996) ("[H]igh-speed chases usually require the exercise of discretion, including decisions about whether to embark on such a chase, what speed to go, what route to take, whether to call for back-up, and when to curtail the chase."). This Court cannot find that the weighing of these factors was not within Officer Long Mandan's discretion under the policy.

Fourth, Uses Many cites to the policy under § I.4.11(C), that "[t]he department expects an officer to terminate involvement in fresh pursuit whenever the risks to personal safety and the safety of others outweigh the danger to the community if the suspect is not apprehended." Doc. 22 at 4–5. Uses Many argues that the pursuit should have been terminated "because the dangers outweighed the benefits," in that the vehicle was initially traveling within the speed limit, Officer Long Mandan did not know the identity or residence of those in the vehicle, and he had no knowledge regarding any other dangerous attributes or crimes committed by the vehicle's occupants. Doc. 22 at 5. Just as with § I.4.11(A)(1), the CRST pursuit policy does not list specific criteria for officers to weigh in determining whether the danger to the community outweighs the risk to personal safety and the safety of others. Instead, it leaves the decision to be made to the officer, absent supervisory direction. The decisions made by Officer Long Mandan

in initiating and continuing the pursuit were within his discretion under the CRST pursuit policy, and all mandates within the CRST pursuit policy—such as activating the siren and emergency lights, alerting dispatch of the pursuit, and avoiding pulling alongside the pursued vehicle—were followed. See Hart, 630 F.3d at 1088; Deuser, 139 F.3d at 1195; Holthusen, 498 F. Supp. 2d at 1242–43.

Finally, Uses Many argues that "[t]he [CRST] Policy clearly required that any pursuit be overseen and supervised by a supervisor." Doc. 22 at 5. The section of the CRST pursuit policy cited by Uses Many does not require that all pursuits involve a supervisor's oversight, but instead lays out a supervisor's responsibility during a pursuit. Doc. 22-1 at § I.4.13. The CRST pursuit policy includes specific things that only a supervisor can authorize during a pursuit, such as ordering the construction of a roadblock, Doc. 22-1 at § I.4.14(B), and states that "[w]hen directed to do so by a higher ranking officer," a pursuit must be discontinued, Doc. 22-1 at § I.4.11(A)(4). However, nothing in the "Pursuit Procedures" section requires notification to a supervisor of the pursuit, or supervisory approval for a pursuit to continue. Doc. 22-1 at § I.4.12. There is a required notification to dispatch, "which will enable the other officers in the area, as well as the dispatcher, to be aware of the pursing officer[']s situation." Doc. 22-1 at § I.4.12(B). The dispatcher is required to "keep track of the progress of the pursuit in order to be able to pass on such information to assisting officers or supervisors." Doc. 22-1 at § I.4.16(B). While the dispatcher is required to call or radio the applicable jurisdiction if the pursuit leaves the reservation, there is no requirement for the dispatcher to notify any supervisor—either on or off duty. See Doc. 22-1 at § I.4.16. The CRST pursuit policy is peppered with statements that, unless "a higher ranking officer" directs a pursuit's termination, it is the pursuing officer's "best

judgment" and "continuous appraisal" that determines whether a pursuit is continued.[3] Doc. 22-1 at § I.4.11. Read as a whole, the CRST pursuit policy vests the officer with the discretion, judgment, and choice of whether and when to pursue a vehicle fleeing a valid attempted law enforcement stop. Uses Many has not identified any CRST policy mandate that a pursuit must be abandoned if a supervisor is unable to be reached. Therefore, the first prong of the discretionary function test is met.

Next, this Court must determine whether Officer Long Mandan's decision in initiating and continuing the pursuit was "grounded in social, economic, or political policy." Dykstra, 140 F.3d at 795. The decisions made by Officer Long Mandan need to be "judgment[s] . . . of the kind that the discretionary function exception was designed to shield." United States v. Gaubert, 499 U.S. 315, 322-23 (1991) (quoting Berkovitz, 486 U.S. at 536). Because the CRST pursuit policy afforded Officer Long Mandan discretion in determining whether to initiation, continue, and terminate a pursuit, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324-25 (noting that the challenged actions need not have actually been the result of a policy analysis, only "susceptible" to one); see also Deuser, 139 F.3d at 1195. The wide discretion granted Officer Long Mandan in determining whether to initiate and continue the pursuit involved "competing concerns of safety, cost, personnel allocation, and agency objectives." Four v. United States ex rel. Bureau of Indian Affairs, 431 F. Supp. 2d 985, 993 (D.N.D. 2006). This Court cannot find, and Uses Many has not provided, any law or facts rebutting the presumption that Officer Long Mandan's acts were grounded in policy when he was exercising the discretion granted him in the CRST pursuit policy. The Eighth

---

[3] See Doc. 22-1 at § I.4.8 ("[G]ood judgment and common sense must be used in every vehicle pursuit."); § I.4.9 ("The seriousness of the possible outcome of a pursuit commands a police officer to weigh many factors when deciding whether or not to pursue the violator."); § I.4.11 ("The pursuing officer must use the best judgment in evaluating a chase, making a continuous appraisal in deciding if the pursuit should be continued.").

Circuit has regarded an officer's decision about the manner to effectuate an arrest as one grounded in policy. See Hart, 630 F.3d at 1090 (citing Dykstra, 140 F.3d at 796; Deuser, 139 F.3d at 1195–96; Mesa v. United States, 123 F.3d 1435, 1438 (11th Cir. 1997)); see also Mesa v. United States, 837 F. Supp. 1210, 1213 (S.D. Fla. 1993) ("The overwhelming consensus of federal case law establishes that criminal law enforcement decisions—investigative and prosecutorial alike—are discretionary in nature and, therefore, by Congressional mandate, immune from judicial review."). This Court has been presented with no reason to treat Officer Long Mandan's decision to initiate and continue the pursuit any differently than an officer's decision of the manner to effectuate an arrest, both falling within the type of judgements shielded by the discretionary function exception.

## IV.    Conclusion

Because the United States' motion to dismiss for lack of subject matter jurisdiction is being granted, this Court need not consider the arguments made in the motion for summary judgment on the question of whether Officer Long Mandan had a specific duty of care towards Brittany and Waco, whether Officer Long Mandan was the proximate cause of Brittany and Waco's deaths, and the applicability of assumption of the risk and contributory negligence doctrines. For the reasons explained above, it is hereby

ORDERED that the Defendant's motion to dismiss for lack of subject matter jurisdiction, Doc. 16, is granted. The portion of the motion that sought summary judgment is deemed moot.

DATED this 7ᵗʰ day of July, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE